**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

THERMO FISHER SCIENTIFIC INC.
AND PATHEON BIOLOGICS LLC,

                Plaintiffs,

    v.

RYAN ARTHUR,

              Defendant.

**Case No. 4:23-cv-01098**

## <u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

Thermo Fisher Scientific Inc. ("Thermo Fisher") and Patheon Biologics LLC ("Patheon"), a wholly owned subsidiary of Thermo Fisher (collectively "the Company"), hereby file this Verified Complaint against its former employee, Ryan Arthur ("Defendant" or "Arthur"), for misappropriating the Company's confidential information and trade secrets, breaching his contractual obligations owed to the Company, and unlawfully accessing and destroying Company data.  In support of the Complaint, the Company states as follows:

## <u>INTRODUCTION</u>

1.      Arthur was a Lead Manufacturing Planning Coordinator at the Company's St. Louis, Missouri, site, who was involuntarily terminated on May 5, 2023.  The Company has been forced to file this action because of Arthur's pattern and practice of exfiltrating the Company's confidential and trade secret information, the full extent of which is still unknown due to his refusal to return Company data in his possession.  After his termination, the Company discovered that Arthur had unlawfully, and in breach of his contractual obligations to the Company, e-mailed to his personal email accounts and downloaded to one or more unknown external USB device(s) a voluminous amount of highly confidential and trade secret information pertaining to the

Company's business.  Arthur has admitted to the Company that he possesses over **One Terabyte** of Company documents, along with emails he sent or received during his employment, hundreds of videos, thousands of photos, and hundreds of screenshots; he has refused to return any of this information to the Company as required by contract.  After he was notified of his termination, Arthur intentionally wiped the hard drive on his Company-issued laptop in a forensically sound manner, thereby preventing the Company from investigating the full extent of his unlawful conduct.

2.      Arthur had no legitimate business need for the highly confidential and trade secret information he sent to his personal e-email accounts and downloaded to an external USB drive(s) during his employment and immediately before and after his termination.  Nor did he have any legitimate reason to access, download, and/or copy the Company's confidential and trade secret information.  He improperly and unlawfully took this information – and is refusing to return it – to cause harm to the Company.

3.      Arthur's misconduct constitutes a breach of contract and violates the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. §§ 417.450, *et seq.* ("MUTSA"), the Defend Trade Secret Act, 18 U.S.C. §§ 1836, *et seq.* ("DTSA"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CAFA"), and the Missouri computer tampering statutes, Mo. Rev. Stat. §§ 537.525 and 569.095, *et seq.* ("MCTS").

4.      The Company will continue to suffer immediate and irreparable harm as a result of Arthur's unlawful actions unless Arthur is enjoined and restrained from further misappropriation of the Company's trade secrets and confidential information and ordered to cease such unlawful conduct and immediately return the stolen information.

## PARTIES

5.      Plaintiff Thermo Fisher Scientific Inc. is a corporation incorporated in the state of Delaware with its headquarters in Waltham, Massachusetts.

6.      Plaintiff Patheon Biologics LLC is a Delaware limited liability company conducting business at 4766 LaGuardia Drive, St. Louis, Missouri, and is a wholly owned subsidiary of Thermo Fisher that was acquired on or about August 2017.

7.      Defendant Ryan Arthur was formerly employed by the Company at Patheon's manufacturing site in St. Louis, Missouri.  Upon information and belief, Arthur is a Missouri citizen who resides at 4432 Olive Street, Apartment G, St. Louis, Missouri, and has a master's degree in information technology.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Arthur, and venue is proper in this District under 28 U.S.C. § 1391(b), because Arthur's conduct occurred in Missouri, he committed and continues to commit unlawful acts directed at and related to Missouri, and a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

### Thermo Fisher and Patheon's Business and Customer Relationships

10.     Thermo Fisher is the world leader in serving science, with a mission to enable its customers to make the world healthier, cleaner, and safer.  Thermo Fisher supports its customers in accelerating life sciences research, solving complex analytical challenges, increasing

productivity in laboratories, improving patient health through diagnostics and the development and manufacture of life-changing therapies.

11.     As a wholly-owned subsidiary of Themo Fisher, Patheon offers contract development and clinical and commercial manufacturing services for large-molecule biopharmaceutical drug substances to pharmaceutical and biotech companies, at its St. Louis site. These drug substances are active pharmaceutical or biopharmaceutical ingredients intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the human body.

**The Company Has a Protectable Interest in its Trade Secrets, Which Are Not Generally Known to The Public or Those Within Pharmaceutical Industry**

12.     The Company has invested considerable time, effort and expense to acquire, aggregate, and analyze its operational processes and structures it has created for use in its ongoing efforts to provide the highest quality manufacturing service for its pharmaceutical customers.

13.     The Company's competitive success depends on a variety of different kinds of confidential information with respect to its manufacturing operations, including products, pricing, operational processes, key performance indicators, and training strategies.  The Company is profitable by virtue of its strategic implementation of pharmaceutical and biopharmaceutical manufacturing techniques (hereinafter pharmaceutical manufacturing techniques), all of which are maintained by the Company as highly confidential and are not generally known in the public domain.  The Company has expended a significant amount of effort and resources to develop and maintain the confidentiality of these types of information.

14.     As the Lead Manufacturing Planning Coordinator, Arthur had access to confidential information concerning the Company's business operations, including, but not limited to, its method and manner of manufacturing its customers' life-changing drug products, its production

inventory and daily plans, its revenue and profitability, its Standard Operating Procedures, and its training programs.

15.     The Company's trade secret and other confidential information is of great value to it and such information would give any competitor who improperly acquired it an unfair competitive advantage by, among other things: (a) not having to expend the time and resources to develop the trade secret information as the Company has done; (b) being able to quickly and effortlessly copy or develop strategies, marketing plans, products, and services to unfairly compete with the Company in order to diminish the Company's competitive advantage; and (c) making it aware of profitable initiatives that should be pursued and unsuccessful practices and procedures that should be avoided. Moreover, the Company's goodwill and reputation would suffer significantly should any trade secret or confidential information of its customers be disclosed to competitors or if competitors used Arthur's actions as leverage to solicit the Company's current or future customers.

16.     The Company's trade secret information is not generally known in the industry and is valuable because the Company derives economic value from the information not being publicly available.  Indeed, the Company derives an economic advantage due to the way in which it keeps its customers' identities, its customers' drugs, and its manufacturing processes and site operations practices confidential.

17.     The Company protects its trade secret and other confidential business information by, among other safeguards, limiting access to the Patheon manufacturing site and securing the site with locked doors accessible by employee-issued badges; requiring password protected computers; limiting access to information; requiring employees to sign a Company Information and Invention Agreement before commencing employment; requiring employees to acknowledge

policies and procedures regarding the authorized use of electronic information and undergo annual ethics training reiterating the Company's strong culture on maintaining confidentiality.

### Arthur's Employment and Relevant Policies and Procedures

18.     Arthur commenced employment at Patheon's St. Louis manufacturing site on or about March 29, 2021, as a formulations technician and was subsequently transitioned into a role as a Lead Manufacturing Planning Coordinator on November 29, 2021.

19.     As a condition of employment, Arthur was required to sign a Company Information and Invention Agreement ("CIIA"), which he acknowledged on March 16, 2021.  (Attached as Exhibit A is Arthur's signed CIIA).

20.     In the CIIA, Arthur promised that he "will not, while employed . . . with the Company and for so long thereafter as the pertinent information or documentation remains confidential, directly or indirectly use, disclose, or disseminate to any other person, organization, or entity, or copy or remove from the Company's premises, any Confidential Information or Trade Secrets [as defined in the Agreement], except as authorized by the Company and then only to such extent as may be necessary in the ordinary course of performing my particular duties as an employee of the Company."  *See* CIIA at ¶ 2.

21.     Furthermore, Arthur agreed "to deliver to the Company, immediately upon separation from employment and at any time the Company so requests, (i) any and all documents, files, notes, memoranda, databases, computer files and/or other computer programs reflecting any Confidential Information or Trade Secrets whatsoever or otherwise relating to the Company's business; . . . and (iii) any computer equipment, home office equipment, . . . or other business equipment belonging to the Company that I may then possess or have under my control."  *See* CIIA at ¶ 3.

22.     The Company requires all employees, including Arthur, to attend annual Ethics & Business Integrity training which includes a review of the Company's Acceptable Use Policy for Technology and a review of the Company's Code of Conduct and Ethics.  Arthur most recently completed the Company's Ethics & Business Integrity training in 2022.

23.     The Company's Acceptable Use Policy details the importance of effective data security measures that involve the participation and support of all employees.  All employees are expected to comply with the policy when interacting with any information technology system, software, or equipment owned or operated by the Company for business purposes.  The policy also requires that all employees safeguard confidential information that belongs to third parties, including customers, suppliers, and distributors.

24.     Section 3.3.1 of the Acceptable Use Policy provides that employees may not attach any third party owned or created removable media, such as USB drives or external hard drives, to Company systems.

25.     Section 3.5.18 of the Acceptable Use Policy restricts employees from using the corporate network in any way that violates Company policies or the Code of Business Conduct and Ethics.

**Arthur's Pattern of Exfiltrating Confidential and Trade Secret Information to His Personal Email Accounts and USB Devices in Violation of Company Policy**

26.     Almost immediately after his employment started with the Company and throughout the entire tenure of his employment, Arthur engaged in a pattern and practice of exfiltrating Company data containing Company confidential information to external private emails accounts and USB device(s) without the Company's knowledge and in violation of the Company's policies and procedures, including the Acceptable Use Policy.

27.    Emails containing Company confidential information and data were sent from Arthur's work account, ryan.arthur@thermofisher.com, to at least two personal email accounts, including rathur751@gmail.com and ryan.arthur0903@gmail.com.

28.    Arthur had no legitimate business interest in emailing himself Company information.  As the Lead Manufacturing Planning Coordinator, Arthur was responsible – along with others on the manufacturing planning team – for placing scheduling orders, ensuring that the required raw materials and supplies get to the production area, coordinating the materials and supplies that needed to be delivered to the site, and then coordinating the movement of the materials and supplies over to the production area.

29.    Arthur worked in an open office setting with his co-workers and was provided with a Company-issued laptop.  He could perform his work-related duties on his laptop both in the office and at home.  At no time did Arthur need hard copy documents or other documents emailed to his personal email accounts to perform his work-related duties.

30.    The data sent by Arthur to his personal email accounts is encompassed within the scope of confidential information as defined in the CIIA, which Arthur acknowledged and agreed to comply with upon the commencement of his employment.

31.    Arthur did not have authorization from anyone within the Company to transfer the Company's trade secrets and confidential information to his personal email accounts.

32.    On April 18, 2023, Arthur told a fellow employee via a Microsoft Teams "Chat" that he had shared Company confidential information with an outside news and journalist organization.

33.     Between May 2, 2023 and the last day of his employment, May 5, 2023, Arthur continued his practice of data exfiltration and downloaded approximately 29.93 GBs of data (over 1,000 documents) to at least one unknown external USB device without authorization.

34.     Upon information and belief, Arthur has exfiltrated more Company data on one or more personal USB devices throughout his employment.

35.     Arthur had no legitimate business reason to copy Company files to a personal USB device and his conduct violated the Company's Acceptable Use Policy.

36.     On May 5, 2023, the Company terminated Arthur's employment.  During the termination meeting, Arthur was instructed not to access the Company's network/systems, buildings or property and was told he would be receiving a box to return his Company-issued equipment.

37.     On May 5, 2023, the Company took reasonable efforts to disable Arthur's access to the Company network and systems.

38.     After Arthur was on notice of his termination and in violation of the Company's instruction not to access the Company's network, he inserted a USB device into his Company-issued laptop and copied 146 .png files with "screenshot" in the file name to that USB device.

39.     Arthur did not timely return all Company documents in his possession or his work equipment, including his laptop and accessories, as required by the CIIA.

40.     As of the date of this civil action, Arthur still has not returned any Company documents in his possession, including any of the emails and attachments he sent himself or any of the documents he copied to USB device(s).

41.     On May 12, 2023, Kara Maciel, undersigned counsel for the Company sent Arthur a letter advising him the Company was investigating suspicious activity that occurred the evening

before he was terminated (May 4, 2023), when Arthur came to Patheon's site and accessed the manufacturing area after-hours and took video and photos on a cell phone without authorization and in violation of Company policies and procedures.  In the May 12 letter, Ms. Maciel notified Arthur that he still had not returned the Company laptop and demanded that he do so within 48 hours as well as identify all Company property, files and/or information in his possession including files, printed materials and pictures.

42.     In the May 12 letter, Arthur was specifically put on notice not to destroy or delete any relevant information – regardless of where it is stored or on what medium it may be maintained – and should he do so, the Company would seek appropriate sanctions for spoliation of evidence.

43.     On May 12, 2023, at about 11:30 pm CDT, Arthur physically delivered his Company-issued laptop and accessories to Patheon's Security Office.  On May 16, 2023, Patheon shipped Arthur's laptop via Federal Express to the Company's Cyber Security Forensic Lab, where it was received on May 17, 2023.  At all times, Arthur's Company-issued laptop remained in the custody and control of the Company's Security and IT departments.

44.     On May 24, 2023, Arthur's Company-issued laptop was assigned to a Digital Forensic Examiner for analysis.  The Examiner subsequently concluded that the laptop's internal storage drive had been wiped in a forensically sound manner.  A forensic "wipe" results in the permanent deletion of any stored data on the internal storage drive.  This deleted data is not recoverable from the storage drive.

45.     On June 16, 2023, Arthur notified the Company that he was in possession of significant and considerable amount of Company data including:

    (a)     emails sent and received with attachments from March 2021 – May 2023;

    (b)     100+ hours of video and audio recordings;

(c)    1000+ photographs;

(d)    700+ snips/screenshots;

(e)    Microsoft Teams conversations from 2022 – 2023; and

(f)    1 TB+ of exfiltrated documents.

46.    The documents Arthur admitted having exfiltrated contained the Company's confidential and trade secret information including, but not limited to:

(a)    All tier-level assessments relating to the performance of the site and its KPI's;

(b)    Documentation regarding pharmaceutical development;

(c)    Price variation documents; and

(d)    All policy and training documents.

47.    On June 28, 2023, Adam D. Hirtz, undersigned counsel for the Company, sent Arthur a letter advising him that by his own admissions in his June 16, 2023 email, it was clear he had misappropriated Company confidential information and/or trade secrets and violated his CIIA. The letter demanded that, to avoid litigation, he must immediately return all of the Company's confidential information and/or trade secrets in his possession, allow for supervised deletion or confirmation of deletion of the same, confirm that none of the Company confidential information and/or trade secrets in his possession had been used or disclosed for any purpose other than for supporting his whistleblower complaint and commit to abide by the terms of the CIIA. Further, Arthur was reminded, again, that under no circumstances should he destroy or alter any Company data, information or documents in his possession.

48.    On July 6, 2023, Arthur responded to the June 28, 2023 letter by incorrectly asserting that he was permitted to retain all the data he took.

49.     On July 10, 2023, Mr. Hirtz responded to Arthur and demanded again that he confirm that none of the Company's confidential information and/or trade secrets in his possession had been used or disclosed and commit to abide by the terms of his CIIA.  Arthur was also asked to make a copy of all Company records, documents and information in his possession and send it to outside counsel to allow the Company to evaluate the data that Arthur stole from the Company.

50.     On July 16, 2023, Arthur refused to provide a copy of Company records, documents and information in his possession.

51.     Upon information and belief, Arthur has used and disclosed and will continue to use and disclose the Company's trade secrets and confidential information with the deliberate purpose of harming the Company's business for his own benefit or those acting in concert with him, at the expense of the Company.

52.     The Company has suffered and will continue to suffer immediate irreparable harm to its business interests, reputation, and goodwill by Arthur's use and/or disclosure of its trade secrets and other confidential information.  Such immediate irreparable harm cannot be adequately redressed by monetary damages alone and will continue unless Arthur is enjoined from his unlawful conduct.

53.     As of the date of this filing, Arthur has not provided the Company with any written assurances that his wrongful conduct will cease, necessitating this Complaint for damages and immediate injunctive relief.

## **COUNT ONE**

### **Violation of the Defend Trade Secrets Act**

54.     The Company restates and re-alleges each allegation as contained in the previous paragraphs with the same force and effect as if fully set forth herein at length.

55.     During his employment, Arthur was provided access to substantial amounts of the Company's trade secrets and confidential information, all of which related to the manufacture of drug products used in, or intended for use in, interstate commerce.

56.     The Company's trade secrets and confidential information are not available to the public and are closely guarded by the Company.  The Company keeps such information strictly confidential to maintain a competitive advantage over its competitors.

57.     The Company's confidential information is considered a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1833, *et seq.*, because the information is not generally known outside of the Company's business, the information is not generally known by others involved in the Company's business, the Company has taken reasonable measures to guard the secrecy of the information, the information is of great value to the Company and its competitors, the Company invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and because the Company continuously uses the information in its business.  The Company's trade secrets are used in, and intended for use in, interstate commerce.

58.     Arthur was under an obligation to keep secret the Company's trade secrets and confidential information during and after his employment with the Company.

59.     Arthur ignored those obligations by misappropriating the Company's trade secrets and confidential information and by using that information for his own personal benefit, or for the personal benefit of others, and at the expense of the Company.

60.     Upon information and belief, Arthur is using the Company's confidential information with the knowledge that such information is a trade secret belonging to the Company.

61.    Arthur's actions constitute the actual and/or threatened misuse of the Company's confidential information and trade secrets.  Immediate injunctive relief against Arthur is therefore appropriate.

62.    Arthur's misappropriation and unauthorized use of the Company's confidential information and trade secrets has been willful and malicious, and the Company has incurred significant damages as a result of that misappropriation and use.

63.    The Company is entitled to recover not only compensatory damages, but also punitive damages and attorneys' fees resulting from Arthur's wrongful misappropriation of the Company's trade secrets and confidential information.

WHEREFORE, the Company respectfully prays that the Court enter judgment in its favor and against Arthur, and award the Company the following relief:

a.    Arthur, his agents, and all those persons in active concert or participation with him, be preliminarily and permanently enjoined from keeping, using, disseminating, disclosing, or providing access to any of the Company's confidential, and/or trade secret information;

b.    Arthur be ordered to return all of the Company's property and confidential, and/or trade secret information;

c.    Arthur be ordered to make available for inspection and imaging to the Company's computer forensic expert any phones, personal computers, personal data devices, e-mail accounts, online storage, or electronic storage devices owned by, assigned to, in his possession, custody or control;

     d.     Arthur be ordered to swear and account for all the Company property, including all information removed, downloaded, transferred, printed, accessed or e-mailed from the Company's computers or computer network;

     e.     Arthur be ordered to provide the Company access to all telephone records, electronic records, files, cloud-based accounts, or e-mail accounts owned, used, or accessed by him, and any of his cloud-based accounts to ensure that the Company's property has been returned;

     f.     The Company be awarded compensatory damages and statutory damages recoverable under 18 U.S.C. 1836(b)(3)(B);

     g.     The Company be awarded exemplary or punitive damages;

     h.     The Company be awarded its costs and reasonable attorneys' fees incurred in bringing this action, and

     i.     The Company be awarded such other and further relief that the Court deems just.

## COUNT TWO

## Violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*

64.     The Company restates and re-alleges each allegation as contained in the previous paragraphs with the same force and effect as if fully set forth herein at length.

65.     The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") prohibits any person who:

     a.     Knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer (18 U.S.C. § 1030(a)(5)(A)).

b.      Intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage (18 U.S.C. § 1030(a)(5)(B)); or,

c.      Intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage or loss (18 U.S.C. § 1030(a)(5)(C)).

66.      Upon notice of his termination on May 5, 2023, Arthur was not authorized to access any of the Company's protected computers.

67.      After notice of his termination on May 5, 2023, Arthur intentionally accessed the Company's laptop without authorization or permission, destroyed the Company's information and records, and caused damage.

68.      The laptop accessed by Arthur was a protected computer that affects interstate commerce. The Company's laptop was connected to the internet and used to service and communicate with employees, customers and vendors located across the country.

69.      Arthur's unauthorized actions impaired the integrity or availability of data and confidential information imperative to the Company's business.

70.      Upon information and belief, before he returned the laptop to the Company on May 12, 2023, Arthur intentionally wiped the laptop's internal storage drive in a forensically sound manner. A forensic wipe results in the permanent deletion of any stored data on the internal storage drive. This deleted data is not recoverable from the storage drive.

71.      Arthur's actions to the Company laptop caused damage to the Company including, but not limited to, significant time and resources spent by the Company's Digital Forensics & Investigation team, as well as internal and outside attorneys investigating this matter and helping the Company prevent further damage.

72.     Furthermore, the time and expense the Company has exhausted to remedy the loss of information caused by Arthur and the lost work hours from multiple Company employees having to focus their attention on recouping the Company information and data has resulted in significant cost to the Company.

73.     The Company's damages exceed $5,000 to date and are expected to increase as the Company continues its investigation.

74.     The Company has suffered and will continue to suffer other compensatory damages from Arthur's violation of the CFAA.

WHEREFORE, the Company respectfully prays that the Court enter judgment in its favor and against Arthur, and award the Company the following relief:

a.      Arthur, his agents, and all those persons in active concert or participation with him, be preliminarily and permanently enjoined from keeping, using, disseminating, disclosing, or providing access to any of the Company's information that he obtained in violation of the CFAA;

b.      Arthur be ordered to return all of the Company's data and/or information that he obtained in violation of the CFAA;

c.      The Company be awarded compensatory damages and statutory damages recoverable under the CFAA;

d.      The Company be awarded its costs and reasonable attorneys' fees incurred in bringing this action, and

e.      The Company be awarded such other and further relief that the Court deems just.

17

## COUNT THREE

### Breach of Contract

75.     The Company restates and re-alleges each allegation as contained in the previous paragraphs with the same force and effect as if fully set forth herein at length.

76.     As a condition of employment, Arthur was required to sign a written Company Information and Invention Agreement, which he did on March 16, 2021.

77.     In the CIIA, Arthur agreed that during his employment he would have access to Company confidential and trade secret information.  He agreed not to disclose such information to any third party for any reason.

78.     The Company performed its obligations under the CIIA by employing Arthur until his termination on May 5, 2023.

79.     By his own admission, Arthur breached the CIIA in several ways, including:

(a)     By copying and removing from the Company's premises its confidential information or trade secrets;

(b)     By not delivering to the Company, immediately upon separation from employment, and in response to Company requests, all documents, files, notes, memoranda, databases, computer files and/or other computer programs reflecting any confidential information or trade secrets;

(c)     By not delivering to the Company, immediately upon separation from employment, and in response to Company requests, the Company laptop in the condition it existed in at the time of his termination.

(d)     By disclosing confidential Information or trade Secrets to an outside news organization and journalist;

80.     As a direct and proximate result of these actions, the Company has been damaged and continues to be damaged in an amount to be determined at the trial of this case, including attorneys' fees and costs as permitted by the CIIA.

WHEREFORE, the Company respectfully prays that the Court enter judgment in its favor and against Arthur, and award the Company the following relief:

      a.     Arthur, his agents, and all those persons in active concert or participation with him, be preliminarily and permanently enjoined from keeping, using, disseminating, disclosing, or providing access to any of the Company's confidential, and/or trade secret information;

      b.     Arthur be ordered to return all of the Company's property and confidential, and/or trade secret information;

      c.     The Company be awarded compensatory damages;

      d.     The Company be awarded its costs and reasonable attorneys' fees incurred in bringing this action, and

      e.     The Company be awarded such other and further relief that the Court deems just.

## COUNT FOUR

### Missouri Uniform Trade Secrets Act

81.     The Company restates and incorporates by reference those allegations as contained in the previous paragraphs with the same force and effect as if fully set forth herein at length.

82.     Arthur's conduct described above constitutes a misappropriation of trade secrets under the MUTSA.

83.     The information belonging to the Company that Arthur improperly exfiltrated during his employment includes information that derives independent economic value, actual or potential, from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and is the subject of reasonable efforts to maintain its secrecy.

84.     Arthur used improper means to gain access to the Company's trade secrets when, without the Company's express or implied consent and in violation of the terms of the CIIA, he electronically transmitted confidential documents containing the Company's trade secrets for purposes other than to serve the Company's interests, and impermissibly retained the trade secrets after his termination.

85.     Arthur's surreptitious conduct breached his contractual and legal duties to maintain the secrecy of the Company's trade secret information, violated Section 569.095 of the Missouri Revised Statutes, violated the federal Computer Fraud and Abuse Act, and, more generally, constitutes espionage through electronic or other means as set forth in Mo. Rev. Stat. 417.453(1).

86.     As a direct and proximate result of these actions, the Company has been damaged and continues to be damaged in an amount to be determined at the trial of this case, including attorneys' fees and costs to the extent allowed by law.

87.     Unless Arthur is permanently restrained from misappropriating the Company's trade secrets, the Company will continue to suffer immediate and irreparable harm.   The Company's damages cannot be adequately compensated solely through money damages or other legal remedies, thereby entitling the Company to equitable relief in the form of an injunction.

88.     Arthur's misappropriation of the Company's trade secret information is outrageous because of Arthur's evil motive and/or reckless disregard of the Company's rights.  He acted without regard for the Company's rights, knowing injury would probably follow.

WHEREFORE, the Company respectfully prays that the Court enter judgment in its favor and against Arthur, and award the Company the following relief:

a.      Arthur, his agents, and all those persons in active concert or participation with him, be preliminarily and permanently enjoined from keeping, using, disseminating, disclosing, or providing access to any of the Company's confidential, and/or trade secret information;

b.      Arthur be ordered to return all of the Company's property and confidential, and/or trade secret information;

c.      Arthur be ordered to make available for inspection and imaging to the Company's computer forensic expert any phones, personal computers, personal data devices, e-mail accounts, online storage, or electronic storage devices owned by, assigned to, in his possession, custody or control;

d.      Arthur be ordered to swear and account for all the Company property, including all information removed, downloaded, transferred, printed, accessed or e-mailed from the Company's computers or computer network;

e.      Arthur be ordered to provide the Company access to all telephone records, electronic records, files, cloud-based accounts, or e-mail accounts owned, used, or accessed by him, and any of his cloud-based accounts to ensure that the Company's property has been returned;

f.      Arthur be ordered to comply with the CIIA;

g.      The Company be awarded compensatory damages and statutory damages recoverable under Mo. Rev. Stat. 417.457;

h.      The Company be awarded exemplary or punitive damages;

i.      The Company be awarded its costs and reasonable attorneys' fees incurred in bringing this action; and

j.      The Company be awarded such other and further relief that the Court deems just.

## CLAIM FIVE

## Missouri Computer Tampering Statutes

89.     The Company restates and incorporates by reference incorporates by reference those allegations as contained in the previous paragraphs with the same force and effect as if fully set forth herein at length.

90.     The Company owns its computer system, computer network, and computer equipment issued to its employees, including the laptop issued to Arthur.

91.     Arthur's conduct violates Section 569.095 of the Missouri Revised Statutes because he knowingly and without authorization and in violation of the Company policies and procedures and the CIIA:

(a)      Destroyed the Company's data and/or documentation residing or existing internal to a computer, computer system or computer network;

(b)      Took the Company's data and/or documentation, residing or existing internal or external to the Company's computer, computer system and/or computer network;

(c)     Retained the Company's data and/or documentation that he knew or believes he obtained without authorization and/or without reasonable grounds to believe he had such authorization.

92.     The Company has been damaged, and is continued to be damaged, by Arthur's conduct in violation of Section 569.095.

WHEREFORE, the Company respectfully prays that the Court enter judgment in its favor and against Arthur, and award the Company the following relief:

a.     Arthur be ordered to return all of the Company's data and/or supporting information that he obtained in violation of Section 569.095;

b.     The Company be awarded compensatory damages and statutory damages recoverable under Mo. Rev. Stats 537.525;

c.     The Company be awarded its costs and reasonable attorneys' fees incurred in bringing this action, and

d.     The Company be awarded such other and further relief that the Court deems just.

## COUNT SIX

## INJUNCTIVE RELIEF

93.     The Company restates and incorporates by reference those allegations as contained in the previous paragraphs with the same force and effect as if fully set forth herein at length.

94.     As described above, Arthur has engaged in several acts of wrongdoing, including breaching his CIIA and violating the DTSA and MTSA, each of which provides for injunctive relief.

95.     Arthur's actions are a real and continuing threat to the Company's business, its confidential and/or trade secret information, its customer relationships, and its goodwill.

96.     Arthur's actions are causing irreparable harm to the Company, including the loss of intangible assets such as reputation and goodwill.  In fact, at Paragraph 14 of the CIIA, Arthur acknowledges that the CIIA was "necessary to protect the Confidential Information and Trade Secrets, business and goodwill of the Company, and that any breach of this Agreement will result in irreparable and continuing harm to the Company."  (*See* Exhibit A, ¶ 14.)

97.     Irreparable harm is properly presumed where confidential information is being improperly used, or where a valid and enforceable confidentiality agreement is breached.

98.     In this case, Arthur used confidential information of the Company without authorization, and has breached valid and enforceable contractual confidentiality provisions.

99.     There is no adequate remedy at law to protect the Company from the loss of its customers, confidential information, and goodwill, as pecuniary remedies fail to provide adequate reimbursement to compensate the Company for the injury or threatened injury of these assets.

100.     The erosion of the Company's customer base and goodwill through use and disclosure of the Company's confidential and/or trade secret information is difficult to quantify monetarily.

101.     The Company has a likelihood of success on the merits of the claims asserted in this Complaint upon which injunctive relief is available.

102.     In Paragraph 14 of the CIIA, Arthur agreed that "the Company shall … be entitled to equitable relief in the form of preliminary and permanent injunctions, without bond or other security upon any actual or threatened breach thereof."  (*See* Exhibit A, ¶ 14.)

103.    Based upon the foregoing, the Company is seeking preliminary and permanent injunctive relief as set forth below.

WHEREFORE, the Company respectfully prays that the Court enter judgment in its favor and against Arthur, and award the Company the following relief:

a.    Arthur, his agents, and all those persons in active concert or participation with him, be preliminarily and permanently enjoined from keeping, using, disseminating, disclosing, or providing access to any of the Company's confidential, and/or trade secret information;

b.    Arthur be ordered to return all of the Company's confidential, and/or trade secret information;

c.    Arthur be ordered to make available for inspection and imaging to the Company's computer forensic expert any phones, personal computers, personal data devices, e-mail accounts, online storage, or electronic storage devices owned by, assigned to, in his possession, custody or control;

d.    Arthur be ordered to swear and account for all the Company property, including all information removed, downloaded, transferred, printed, accessed, or e-mailed from the Company's computers or computer network;

e.    Arthur be ordered to provide the Company access to all telephone records, electronic records, files, cloud-based accounts, or e-mail accounts owned, used, or accessed by him, and any of his cloud-based accounts to ensure that the Company's property has been returned;

f.    Arthur be ordered to comply with the CIIA;

g.    The Company be awarded compensatory damages and statutory damages;

       h.      The Company be awarded exemplary or punitive damages;

       i.      The Company be awarded its costs and reasonable attorneys' fees incurred in bringing this action, and

       j.      The Company be awarded such other and further relief that the Court deems just.

Dated: August 30, 2023

Respectfully submitted,

/s/ Kara Maciel
Kara M. Maciel, Esq. (to be admitted pro hac vice)
Jordan Schwartz, Esq. (to be admitted pro hac vice)
Conn Maciel Carey LLP
5335 Wisconsin Avenue, NW, Suite 660
Washington, DC 20015
T: (202) 909-2730
F: (202) 607-2993
E: kmaciel@connmaciel.com
   jschwartz@connmaciel.com

/s/ Adam D. Hirtz
Adam D. Hirtz, #48448MO
Jackson Lewis P.C.
1 N. Brentwood Blvd., Suite 1150
St. Louis, MO 63105
T:  (314) 827-3939
F:  (314) 827-3940
E: adam.hirtz@jacksonlewis.com

*Counsel for Thermo Fisher Scientific Inc. and Patheon Biologics LLC.*

## **VERIFICATION**

Julia Chen, under penalty of perjury, verifies that she is the Vice President, Deputy

General Counsel & Corporate Secretary for Thermo Fisher Scientific Inc., and the facts in this

Verified Complaint (except for those facts based upon information and belief) are true and

accurate to the best of her knowledge, or true to the best of her information and belief if

compiled by others.

/s/*

## **NOTARIZATION**

Commonwealth of Massachusetts
County of Middlesex        } ss

     On this the 29 August, 2023, before me, Kristen M. Zinkowsky, the undersigned Notary
Public, personally appeared Julia L. Chen, proved to me through satisfactory evidence of
identification, which was based on personal knowledge, to be the person whose name is signed on
the preceding or attached document, and acknowledged to me that she signed it voluntarily for its
stated purpose as Vice President, Deputy General Counsel & Corporate Secretary of Thermo
Fisher Scientific Inc.

Before me,

Signature of Notary Public
Kristen M. Zinkowsky
Printed Name of Notary
My Commission Expires: July 31, 2026

Kristen M. Zinkowsky
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
July 31, 2026

    *Counsel hereby certifies that she has a signed copy of the foregoing document available

for inspection at any time by the Court or a party to this action.

## **VERIFICATION**

Julia Chen, under penalty of perjury, verifies that she is President of Patheon Biologics

LLC, and the facts in this Verified Complaint (except for those facts based upon information and

belief) are true and accurate to the best of her knowledge, or true to the best of her information

and belief if compiled by others.

/s/* _Jh. Chen_

### **NOTARIZATION**

### **NOTARIZATION**

Commonwealth of Massachusetts
County of Middlesex             } ss

On this the 29 August, 2023, before me, Kristen M. Zinkowsky, the undersigned Notary
Public, personally appeared Julia L. Chen, proved to me through satisfactory evidence of
identification, which was based on personal knowledge, to be the person whose name is signed on
the preceding or attached document, and acknowledged to me that she signed it voluntarily for its
stated purpose as President of Patheon Biologics LLC.

Before me,

Signature of Notary Public
Kristen M. Zinkowsky
Printed Name of Notary
My Commission Expires: July 31, 2026

> Kristen M. Zinkowsky
> Notary Public
> COMMONWEALTH OF MASSACHUSETTS
> My Commission Expires
> July 31, 2026

*Counsel hereby certifies that she has a signed copy of the foregoing document available

for inspection at any time by the Court or a party to this action.